**In re Anonymous No. 12 D.B. 79**

Disciplinary Board Docket no. 12 D.B. 79.

McDONNELL, *Board Member*, May 5, 1980—Pursuant to Rule 208(d)(iii) of the Pennsylvania Rules of Disciplinary Enforcement (rules), the Dis-

ciplinary Board of the Supreme Court of Pennsylvania (board), herewith submits its findings and recommendations to your honorable court with respect to the above petition for discipline.

## I. HISTORY OF PROCEEDINGS

On May 10, 1979, the Office of Disciplinary Counsel filed a petition for discipline against respondent which petition was served on respondent. No appearance of counsel was entered on behalf of respondent, nor was any answer filed.

A hearing committee was appointed on May 31, 1979, and a hearing took place on August 9, 1979. At that hearing neither respondent nor counsel on his behalf were present.

The petition for discipline alleged that respondent violated the following disciplinary rules:

D.R. 1-102(A)(4) A lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation;

D.R. 1-102(A)(5) A lawyer shall not engage in conduct that is prejudicial to the administration of justice;

D.R. 1-102(A)(6) A lawyer shall not engage in any other conduct that adversely reflects on his fitness to practice law;

D.R. 6-101(A)(3) A lawyer shall not neglect a legal matter entrusted to him;

D.R. 6-102(A) A lawyer shall not attempt to exonerate himself from or limit his liability to his client for his personal malpractice;

D.R. 7-101(A)(1) A lawyer shall not fail to seek the lawful objectives of his client through reasonably available means permitted by law and the Disciplinary Rules, except as provided by D.R.

7-101(B). A lawyer does not violate this Disciplinay Rule, however, by acceding to reasonable requests of opposing counsel which do not prejudice the rights of his client, by being punctual in fulfilling all professional commitments, by avoiding offensive tactics, or by treating with courtesy and consideration all persons involved in the legal process;

D.R. 7-101(A)(2) A lawyer shall not fail to carry out a contract of employment entered into with a client for professional services, but he may withdraw as permitted under D.R. 2-110, D.R. 5-102, and D.R. 5-105;

D.R. 7-101(A)(3) A lawyer shall not prejudice or damage his client during the course of the professional relationship, except as required under D.R. 7-102(B);

D.R. 7-102(A)(5) A lawyer shall not knowingly make a false statement of law or fact;

D.R. 9-102(B)(4) A lawyer shall promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive.

A stipulation of facts was entered into by assistant disciplinary counsel and respondent, wherein respondent admitted the allegations of fact contained in Charges I, II, IV and V, of the petition for discipline. No stipulation was entered into with regard to Charge III. Also stipulated to was respondent's prior disciplinary record which included a prior informal admonition as well as a public censure.

The hearing committee found respondent in violation of all of the above mentioned rules, and recommended disbarment. No exceptions were taken.

## II.  FINDINGS OF FACT

### Charge I - Client A

1.  Client A believed that the repossession of his tractor trailer had been improper and, therefore, retained respondent on or about January 1, 1970, to sue the repossessor.

2.  From 1971 through 1975, respondent repeatedly assured Client A that suit had been filed and that negotiations for a settlement were in progress.

3.  In or about February of 1976, respondent told Client A that the claim against the repossessor had been settled for $35,000 when, in fact, no settlement had been made.

4.  On February 11, 1976, respondent furnished Client A with a signed statement acknowledging receipt of two releases from Client A; those releases were to be retained by respondent until payment of the settlement sum of $35,000 by the repossessor.

5.  On or about February 18, 1976, respondent informed Client A that he had received the settlement check in the amount of $35,000.

6.  Because respondent did not surrender this sum, Client A retained other counsel to obtain the settlement proceeds from respondent.

7.  From early March 1976, until March 23, 1976, respondent gave repeated excuses and promises to new counsel regarding delivery of the settlement check. Finally, on March 23, 1976, respondent met personally with new counsel and admitted that no suit had in fact been filed on behalf of Client A, and that no settlement in fact existed.

8.  Respondent paid approximately $5,300 to

Client A as settlement for his failure to institute suit.

### Charge II - Client B

9. Client B retained respondent in late April of 1971 to aid him in the administration of his mother's estate.

10. Letters testamentary were issued to Client B as Estate No. 71-55, on April 29, 1971.

11. The estate contained, inter alia, two parcels of real property, stock, and miscellaneous property. The gross estate totalled approximately $104,303.77.

12. By letter dated November 15, 1971, respondent requested a complete list of estate expenditures from Client B. Respondent stated that upon receipt of this information he would be able to compute the inheritance taxes owed and would forward the various tax returns to Client B for execution. Client B provided the estate expenses on or about December 22, 1971.

13. Although respondent prepared an inventory and appraisement, a statement of debts and deductions, and a first and final account for the estate and had these executed by Client B on or about October 2, 1973, he took little action to settle the estate despite repeated inquiries from Client B.

14. The Pennsylvania Transfer Inheritance Tax became due on the estate on July 21, 1972. Respondent first requested money from Client B for tax due in a letter of October 4, 1974. Client B forwarded a check in the amount of $6,029.10 to respondent as requested for payment of the Pennsylvania Transfer Inheritance Tax.

15. Respondent dealt with the Pennsylvania Transfer Inheritance Tax as follows:

(a) On or about October 15, 1974, he tendered payment of the $6,029.10 check to the Bureau of Collections;

(b) On December 2, 1974, respondent mailed the Pennsylvania Transfer Inheritance Tax return and an award of real estate to Client B, who executed and returned them to respondent;

(c) Because respondent had failed to file a statement of debts and deductions, which had been in his possession since on or about October 2, 1973, the tax due was computed on the value of the gross estate and a bill for additional tax and interest due of $1,102.50 was eventually sent to Client B;

(d) On or about March 26, 1975, Client B sent a check for $1,102.50 to the Bureau of County Collections;

(e) On April 9, 1975, respondent filed a statement of debts and deductions, which resulted in the discovery that an overpayment of $726.10 had been made;

(f) Client B was notified of the overpayment and he requested respondent to file for a refund. Respondent failed to seek a refund within the applicable two-year period, and the estate is now barred from seeking a refund;

(g) Due to respondent's failure to file Pennsylvania Inheritance Tax return and pay taxes due by July 21, 1972, the estate incurred an interest payment in the amount of $766.32.

16. Respondent dealt with the Federal Estate Tax which became due on December 21, 1971, as follows:

(a) On August 22, 1975, respondent forwarded the Federal Estate Tax returns to Client B for execution;

(b) Client B returned the executed form and a

check in the sum of $4,099.48 for payment of tax due to respondent on August 27, 1975;

(c) Respondent failed to file the Federal Estate Tax return or to remit the $4,099.48 check to the Internal Revenue Service;

(d) As a result of respondent's failure to file the return, the estate incurred $3,636.32 in interest and penalty charges.

17. Respondent was contacted by an investigator for the Disciplinary Board on or about December 9, 1977. Respondent stated at that time that he had filed the Federal Estate Tax return in or about September of 1975, which was incorrect.

18. On or about February 14, 1978, respondent stated to an investigator for the Disciplinary Board that he had recently contacted the IRS by phone concerning the estate, and that he had sent a copy of the Federal Estate Tax return to that office. In fact, respondent had not sent a copy of the Federal Estate Tax return to the IRS.

19. As of July 26, 1978, respondent had failed to file the following documents relative to the estate:

(a) The first and final account, which had been in his possession since on or about October 2, 1973;

(b) The proposed schedule of distribution, which had been in his possession since on or about October 8, 1974;

(c) The award of real estate which had been in his possession since on or about December 9, 1974;

(d) The application for refund of Pennsylvania Transfer Inheritance Tax, which had been in his possession since on or about May 22, 1975;

(e) The Federal Estate Tax return which had been in his possession since in or about September of 1975.

20. Respondent was discharged in or about

March of 1978, and new counsel was retained. Respondent, however, failed to promptly deliver the estate file to successor counsel, despite repeated requests and his promise to cooperate.

## Charge III - Client C

21. On December 14, 1973, respondent caused letters testamentary to be issued on behalf of Client C's estate.

22. In 1974, Client C, acting both as an heir and as an agent or representative of the co-executrices, directed respondent to take the following action:

(a) Sell the real property;

(b) Pay the estate's debts;

(c) Pay the inheritance tax;

(d) Effect transfer in kind of decedent's stock; and

(e) Make appropriate distributions of any remaining cash.

23. Despite notice by the Bureau of County Collections and repeated requests from Client C, respondent failed to pay the Pennsylvania Transfer Inheritance Tax. This failure led to a request for legal action by the Department of Revenue on or about January 28, 1975, and ultimately, an order issued from the Orphans' Court of [   ] County to a co-executrix directing her to file a return by August 1, 1975.

24. Despite renewed requests from Client C and the threat that a contempt citation would be received by a co-executrix, respondent did not complete all necessary procedures on the transfer inheritance tax until February 17, 1976, the tax due amounting to $526.10, which included interest penalties of approximately $63.20.

25. Despite repeated requests since 1974, respondent failed to cause the real estate to be sold until in or about September of 1976.

26. Despite repeated requests, respondent did not furnish a first and final account until on or about November 15, 1977, and, as of March 14, 1978, has failed to file the first and final account.

27. Respondent made a distribution of the cash in the estate on or about February 22, 1978, but as of at least October 9, 1978, he has failed to effect the transfer of the stock.

28. On or about January 27, 1976, as the result of another matter, respondent, through the representation of counsel, provided the Office of Disciplinary Counsel with a false and/or misleading summary of the estate.

### Charge IV - Client D

29. Respondent was retained by Client D to represent him in three separate legal matters.

30. In 1969, respondent agreed to file suit on behalf of Client D for personal injuries and property damages sustained by Client D in a vehicular accident.

31. Respondent represented to Client D that such a suit had been filed, but, in fact, no suit was filed on his behalf.

32. Respondent further represented to Client D that he was negotiating with defendant's insurance carrier, but, in fact, no such negotiations took place.

33. In 1972, respondent represented to Client D that a $5,000 settlement had been secured in this matter, and had Client D execute a release for $5,000 in favor of defendant. In fact, no settlement had been reached with defendant or his insurance carrier.

34. During 1972, 1973 and 1974, respondent made periodic payments to Client D; these payments totalled approximately $3,750, and were purported to be payments on the alleged settlement with the insurance company.

35. In 1972, respondent was retained by Client D to file suit for an alleged breach of an oral contract of sale on a boat. Respondent did not file any suit.

36 In 1975, respondent represented to Client D that a settlement in the sum of $2,900 had been secured; this representation was false and respondent knew it to be false.

37. During 1975, 1976 and 1977, respondent made periodic payments to Client D; these payments totalled approximately $2,175 and were purported to be payments on the alleged settlement.

38. In 1972, Client D retained respondent to represent him in the dispute that arose when Client D refused to pay the repair bill on his truck and the motor company retained possession.

39. In 1974, respondent informed Client D that a $23,000 settlement was being negotiated with the motor company's insurance carrier; however, in fact, no such negotiations took place.

40. In or about August of 1977, Client D wrote a letter concerning respondent's inaction to the [   ] County Court. Respondent, after being contacted by the court administrator, promised to tender the settlement proceeds to Client D. In fact, there were no such settlement proceeds.

41. Subsequently, respondent promised to continue to represent Client D in this matter without fee, but respondent has failed to take any action on behalf of his client against the motor company.

42. Since September of 1977, respondent paid Client D approximately $300 per month, which was

purported to be an advance from the alleged settlement from the motor company.

### Charge V - Client E

43. This charge contains three different matters.

44. Respondent was retained by Client E in 1961 to institute suit against an insurance company when a dispute arose over a payment on a claim for damages to Client E's Cessna 310 Aircraft, which had been damaged on April 12, 1961.

45. Respondent initiated suit by filing a praecipe for summons in assumpsit in [ ] County, Pennsylvania.

46. Subsequent to 1964 and until 1975, respondent represented to Client E that a default judgment in the amount of $53,000 had been secured in the suit against the insurance company, and that the judgment had been upheld by the Pennsylvania Supreme Court.

47. On August 10, 1974, respondent prepared a letter averring that payment of $53,000 would be forthcoming to Client E; this letter was given to Client E to aid him in securing financing for various personal matters.

48. Respondent had not prosecuted the suit against the insurance company; no settlement negotiations had ever taken place; and no judgment in favor of Client E had been entered.

49. Client E requested by letter dated January 8, 1975, that respondent withdraw his appearance in the suit instituted in [ ] County, Pennsylvania; between January 8 and January 14, 1975, respondent, without filing a praecipe to withdraw, entered a handwritten notation on the [ ] County Continuance Docket, withdrawing his appearance, which withdrawal of appearance is dated January 13, 1964.

50. In the spring of 1972, respondent was retained by Client E and another to prosecute their rights under an agreement of sale dated March 1, 1970, on which the buyers had defaulted.

51. The properties, four laundromats, which had been the subject of the agreement of sale, were extensively damaged in the flood of June, 1972.

52. Respondent represented to Client E that from 1972 through 1974, the buyers had applied for an SBA loan; that the proceeds were forthcoming and would be made available to Client E as payment of the debt on the sales agreement.

53. On August 10, 1974, respondent prepared a letter averring that a sum of $60,000 was forthcoming and payable to Client E from the proceeds of the SBA loan; this letter was given to Client E to aid him in securing financing for various personal matters.

54. At the time he prepared his letter of August 10, 1974, respondent knew the SBA loan application of the buyers had been denied.

55. As a result of respondent's actions as outlined in paragraphs 44 through 54 inclusive, Client E filed a suit in trespass and assumpsit on April 18, 1975, in [   ] County against respondent and his law partners or associates.

56. On September 8, 1976, this suit was settled for a total of $65,000, which was paid as follows: $25,000 by Transamerica Insurance Group, the professional liability insurance carrier for the law firm; $10,000 by Continental Casualty Company, respondent's professional liability insurance carrier; and $30,000 by respondent personally.

## III. DISCUSSION

Respondent's representation in Charge I, that he had filed suit on behalf of his client and settled the

case for $35,000 when, in fact, no suit had ever been filed, is clearly in violation of D.R. 1-102(A)(4), D.R. 1-102(A)(6), D.R. 6-101(A)(3), D.R. 7-101(A)(1), D.R. 7-101(A)(2), D.R. 7-101(A)(3), and D.R. 7-102(A)(5).

The committee found that respondent consistently failed to meet deadlines, file required documents, cause taxes to be paid on time, and misrepresented these facts to his clients.

Also, in Charge I, the committee found that respondent made a payment of $1,500 to Client A in an attempt to exonerate himself from liability to Client A, which the committee found to be in violation of D.R. 6-102(A). It appears that respondent personally paid over $49,000 to or on behalf of clients to either cover up his failure to act, or an attempt to achieve a settlement for his neglect.

Regarding Charge II, respondent, as a result of his neglect, cost the estate in excess of $4,000 in interest and penalties, and no restitution appears to have been made. In that same estate, we found respondent also failed to promptly deliver the file to either the executor or successor counsel, in violation of D.R. 9-102(B)(4).

As for Charge III, the evidence clearly showed that respondent failed to file the necessary estate tax papers, causing additional interest and penalties to be added to the tax bill.

In Charge IV, which involved Client D in three different legal matters, respondent again told the client that a settlement had been made when, in fact, no settlement, nor even negotiations, had taken place.

Charge V, again, involved a client in three differnt legal matters and again, respondent made representations that a default judgment had been

obtained, and that the judgment was upheld by the Pennsylvania Supreme Court when, in fact, no such judgment was ever obtained. In that charge, respondent failed to withdraw as counsel upon the client's request for a long period of time and did not file the necessary praecipe of withdrawal.

Finally, the committee found that respondent made several misrepresentations of fact to the Disciplinary Board Investigator, and provided the Office of Disciplinary Counsel with a false and misleading summary of his work as contained in Charge III, all in violation of D.R. 1-102(A)(4); D.R. 1-102(A)(5); D.R. 1-102(A)(6); and D.R. 7-102(A)(5).

There is no question that the record fully supports the committee's findings of violations by respondent of all the disciplinary rules cited, and therefore justifies the recommendation that respondent be disbarred from the practice of law.

This court has previously upheld the board's recommendation of disbarment in many similar cases. In In the Matter of Leopold, 469 Pa. 384, 392, 366 A. 2d 227 (1976), the court pointed out: "The public position of one who is a member of the legal profession is one of great responsibility. Integrity and the exercise of good faith in an attorney's professional engagements are essential for the protection of the public, the courts and the profession itself. It must be fully appreciated that each member of the bar is an officer of the Court. Consequently, it is the solemn duty of the judiciary to insure that the proper standing of its officers is preserved."

Disbarment was also upheld for failure to turn over funds to the client and to properly preserve the identity of the client's funds in the case of In the Matter of Green, 470 Pa. 164, 368 A. 2d 245 (1977).

The board, after reviewing the entire record and taking into consideration respondent's prior disciplinary record, that included an informal admonition and a public censure, concurs in the committee's recommendation of disbarment.

## IV. RECOMMENDATION

For the reasons set forth above, the Disciplinary Board recommends to your honorable court that respondent be disbarred from the practice of law.

## ORDER

EAGEN, *C.J.*, And now, May 30, 1980, the recommendation of the Disciplinary Board of the Supreme Court of Pennsylvania dated May 5, 1980 is accepted; and it is ordered, that the said [  ], be, and he is forthwith disbarred in accordance with Rule 204(1) of the Pennsylvania Rules of Disciplinary Enforcement, from the practice of law in this court and in all the courts under its supervisory jurisdiction and until the further order of the Supreme Court.